IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **BETTY J. PETTIES,** | ) |
| Plaintiff, | ) |
| v. | ) Civil No. 11-063-GPM-CJP |
| **MICHAEL J. ASTRUE,** <br> **Commissioner of Social Security,** | ) |
| Defendant. | ) |

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge G. Patrick Murphy pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Betty Jo Petties seeks judicial review of the final agency decision finding that she is not disabled and denying her Disability Insurance Benefits (DIB) and Disabled Widow's Benefits (DWB) pursuant to **42 U.S.C. § 423**.

## Procedural History

Plaintiff filed an application for DIB and DWB in January, 2007, alleging disability beginning on June 30, 2000.[1] After the application was denied initially and on reconsideration, a hearing was held before Administrative Law Judge (ALJ) David J. Agatstein. ALJ Agatstein denied the application for benefits in a decision dated June 4, 2009. (Tr. 10-19). The Appeals Council denied review, and the June 4, 2009, decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint.

---

[1] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The regulations pertaining to DWB are found at 20 C.F.R. §§ 404.335 and 404.337. The definition of disability is the same for both kinds of benefits. See, 20 C.F.R. § 404.335(c), incorporating the definition of disability set forth in the DIB regulations into the DWB regulation.

-1-

## Issues Raised by Plaintiff

Plaintiff raises three issues:

(1) The ALJ erred in not finding that plaintiff's venous insufficiency was a severe impairment.

(2) The ALJ's credibility assessment was erroneous.

(3) The ALJ erred in failing to accept all limitations found by plaintiff's treating doctor.

## Applicable Legal Standards

In order to receive DIB or DWB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, a person is disabled when he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3).** Pursuant to 404 C.F.R. 404.335(c), the definition of disabled for purposed of DWB is the same as the definition for purposes of DIB.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. It must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See,** *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984).** The Commissioner's burden at step five is to show that there are a significant number of jobs in the economy that claimant is capable of performing. **See, Bowen v. Yuckert, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).**

In a DIB case, a claimant must establish that she was disabled as of her date last insured. **Stevenson v. Chater, 105 F.3d 1151, 1154 (7th Cir. 1997)**. For DWB, she must show that she was disabled as of the date she was last eligible. It is not sufficient to show that the impairment was present as of the date last insured or eligible; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date. **Martinez v. Astrue, 630 F.3d 693, 699 (7th Cir. 2011)**.

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mrs. Petties was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing **Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richard v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Agatstein followed the five-step analytical framework described above. He determined that Mrs. Petties was last insured for DIB as of June 30, 2005, and that her eligibility for DWB expired as of January 31, 2004. He found that she had not been engaged in substantial gainful activity since the alleged onset date. He found that she has severe impairments of low back pain, knee pain, obesity and seizure disorder, and that her condition does not meet or equal a listed impairment. He found that her sleep apnea, depression and venous insufficiency of the legs were not severe impairments.

The ALJ concluded that Mrs. Petties had the RFC to perform a limited range of work at the sedentary exertional level. A VE testified that she was able to perform the jobs of hand packer and assembler, both of which exist in significant numbers in the regional economy. The ALJ accepted this testimony and found that plaintiff could perform those jobs and was therefore not disabled. (Tr. 10-19).

### The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1.     Agency Forms**

Mrs. Petties was born in 1956, and alleged that she became disabled on June 30, 2000. The date last insured for DIB based on her earnings was June 30, 2005, and her eligibility for DWB based on her late husband's earnings expired as of January 31, 2004. (Tr. 159).

In a Disability Report dated February 2, 2007, plaintiff indicated she was 5'3" and weighed 225 pounds. (Tr. 162). She said she stopped working on June 30, 2000, because she could not deal with the stress of the job. (Tr. 163). She had worked as a cook in a cafeteria from 1986 to 1994, and as a split case picker in a distribution center from 1994 to 2000. (Tr. 164).

Mrs. Petties completed an Activities of Daily Living Questionnaire in which she said she cooked meals, cleaned house, did laundry and shopped for groceries. She was unable to do some chores because of her back. (Tr. 179). She said she was forgetful and heard voices. (Tr. 180). She was asked to complete a Seizure Questionnaire, but, instead of answering the questions, she wrote "can't remember- please check medical records." (Tr. 187-189).

**2.     Medical Records up to date last eligible for DWB (January 31, 2004)**

On January 14, 2000, Mrs. Petties went to the emergency room at Crossroads Community Hospital after a table collapsed at work and struck her left upper leg. She had pain in the left knee. She had previously had surgery on the left knee for a cartilage problem. Her left leg had been shorter than the right since birth. She had no objective signs of injury. Her range of motion was normal. No treatment was required. (Tr. 296).

On January 19, 2000, it was noted that she had a Baker's cyst in her left knee. (Tr. 294).

Dr. Houle treated Mrs. Petties at the Orthopedic Center of Southern Illinois in 2000. The date on the first note is illegible, but the visit apparently took place in June, 2000. Dr. Houle noted that she had a prior knee surgery, and she had severe arthritis throughout her left knee. She had quit her job, and the doctor thought she needed to find work where she was sitting most of the time. (Tr. 237). Dr. Houle began a series of injections into the knee in an effort to try

conservative treatment before considering additional surgery. (Tr. 237).

In December, 2000, Dr. Houle noted that her left knee was swollen and not doing well. Although she had done well with the Synvisc injections, she had not been in for a while as she said she had "seen enough doctors recently." The doctor recommended Celebrex and possible cortisone injections. The doctor placed "permanent" restrictions of sedentary work with no bending or squatting, and she must keep her arms low. (Tr. 236).

She had Synvisc injections in the left knee in March and April, 2001, which gave her some relief. (Tr. 235-236).

In July, 2001, she complained of "horrific calf pain." A Doppler study a couple of months earlier had been negative for deep vein thrombosis, and she had no clinical signs of that condition. Dr. Houle sent her for physical therapy. (Tr. 233-234). By August, 2001, her calf pain was resolved. (Tr. 233).

In January, 2002, Dr. Houle noted that conservative measures had been tried, and he was considering arthroscopic surgery to the left knee. (Tr. 232).

On February 14, 2002, x-rays of the cervical spine showed minimal degenerative changes at C4 to C6. She had slight straightening of the normal curvature, possibly related to muscle spasm. (Tr. 291).

On September 13, 2002, Dr. David Kelley, plaintiff's family doctor, noted that she had advanced osteoarthritis of her knees, but she was getting along pretty well. Her seizure disorder and depression were stable. (Tr. 449).

On September 19, 2002, Mrs. Petties went to the emergency room after she suffered a fall. She hit her head but did not lose consciousness. She complained of pain in her right hip and thigh and her left knee. She was told to use ice and take Tylenol, and to follow-up with her doctor. X-rays showed arthritic changes of the right knee and osteoporosis of the right hip. (Tr.

286-289).

Mrs. Petties saw Dr. Houle in October, 2002, and the doctor noted that she had injured her right shoulder when she fell, and she was unable to pick up a gallon of milk. (Tr. 232). She also complained of neck pain. (Tr. 231).

In October, 2002, a cervical spine x-ray was normal. (Tr. 285).

On December 2, 2002, Dr. Kelley again noted that her seizure disorder was stable. (Tr. 352). On December 9, 2002, Dr. Houle noted that she was feeling better. (Tr. 231).

In June, 2003, Mrs. Petties went to the emergency room and "had a fairly extensive workup for what turned out to be a sprained ankle," according to Dr. Kelley. (Tr. 346). A venous Doppler study of the left leg was normal, as were x-rays. (Tr. 278). An x-ray of the left foot showed degenerative arthritis. (Tr. 277). Dr. Houle recommended she wear a walking boot for a while due to foot pain. (Tr. 230). When Dr. Kelley saw her on June 12, 2003, she was wearing the boot and had no swelling. Her weight was 256 pounds. (Tr. 346).

She complained of right shoulder pain in July of 2003. X-rays were negative, but her shoulder was stiff. (Tr. 230). She had physical therapy, and showed "excellent recovery" by late August, 2003. She was doing well and was to return to see Dr. Houle only on an as-needed basis. (Tr. 229).

Dr. Kelley again noted that her seizure disorder and depression were stable in November, 2003. (Tr. 342).


**3.**  **Medical Records up to date last insured for DIB (June 30, 2005)**

On March 19, 2004, plaintiff called Dr. Kelley's office and said she had pain in her right hip with muscle spasms into her leg, and slight pain in her low back. He prescribed Darvocet and an appointment was made for her to see Dr. Houle on March 29, 2004. (Tr. 337). However,

Dr. Houle's records indicate that plaintiff cancelled her appointment with him and did not reschedule. (Tr. 229).

In May, 2004, plaintiff saw Dr. Houle after she hurt her right thumb lifting a bottle of detergent. X-rays showed she had no fractures, and this was diagnosed as a sprain. (Tr. 229). A bone scan showed she had arthritis in the hand. (Tr. 227).

Mrs. Petties was diagnosed with mild sleep apnea in June, 2004. Weight loss was recommended. (Tr. 267-268).

She fell on her left knee in November, 2004. Her knee was swollen, and x-rays showed significant osteoarthritis. Dr. Houle noted that she had an "adequate" range of motion. She had been given Flexeril and Vicodin and was to use ice. (Tr. 227). In February, 2005, Dr. Houle noted that she was doing well except that her thumb was still stiff. Generic Vicodin had made her sick to her stomach, so she stopped taking it. (Tr. 226).

In March, 2005, her left knee again swelled up after she walked up the stairs. Range of motion was limited, but her ligaments were intact. Dr. Houle noted she was sensitive to arthritis medications. He injected her knee with cortisone, which helped. (Tr. 225). Another injection was done on May 18, 2005. (Tr. 225).

On April 21, 2005, a venous Doppler study of the right leg showed no deep venous thrombosis. (Tr. 264).

Dr. Houle injected her left knee with Lidocaine and Synvisc in May and June, 2005, which helped her knee pain. (Tr. 224-225).

**4.   Subsequent Medical Records**

On July 18, 2005, Dr. Houle noted that she was doing pretty well following the knee injections, and she was to return in December to repeat the injections if needed. (Tr. 224).

On July 27, 2005, plaintiff went to the emergency room for back pain. X-rays showed

only mild degenerative changes at L3 and L3. (Tr. 260). The next day, a lumbar MRI showed some mild disc protrusion at L4-5 and canal stenosis. (Tr. 261).

On August 29, 2005, she returned to Dr. Houle with a "new problem" of back pain radiating into her right leg. On exam, she had weakness of plantar flexion and subjective decreased sensation, but no other obvious findings of weakness. Deep tendon reflexes were normal. He suggested an epidural injection if her pain persisted. (Tr. 223). In September of 2005, Mrs. Petties told Dr. Kelley that she had recently been in a car accident which had exacerbated her back pain. She was having radiating pain down the right leg. (Tr. 321). She had a series of injections, and, in December, 2005, reported to Dr. Houle that her right leg pain was better. She was taking an occasional Vicodin and sometimes muscle relaxers for her back. (Tr. 222).

In June, 2006, Mrs. Petties saw Dr. Houle with complaints of numbness in various parts of her body and cold intolerance in her mouth. He was unable to explain these symptoms. (Tr. 219).

Mrs. Petties saw Dr. Kelley in the emergency room for swelling in her right leg on August 8, 2006. Again, a Doppler study showed no deep vein thrombosis. (Tr. 312). On August 31, 2006, Dr. Kelley noted that she had chronic venous insufficiency in legs. Her seizure disorder was stable on Depakote, and her depression was stable on no medication. He told her to elevate her feet as much as possible, wear support hose and watch her salt intake. (Tr. 310).

**5.     Evidentiary Hearing**

The evidentiary hearing took place on May 11, 2009. Plaintiff was represented by counsel. (Tr. 23).

Mrs. Petties testified that she last worked as a split case picker at a Walgreens

distribution center. She said that her most serious health problem was severe pain in her low back. (Tr. 27-28). She had not had back surgery. (Tr. 29). She testified that her back problems began around May of 2004, and they came on her gradually. (Tr. 30-31).

She said that her medical condition was worse than it had been in 2004 or 2005. (Tr. 35). She also said that she had been wearing Jobst support stockings since 2000. (Tr. 37). Dr. Kelley told her to wear them to reduce swelling in her legs. He also told her to elevate her feet. This was 5 years earlier. (Tr. 37-38).

Dr. Rack, a board-certified neurologist, testified as an independent medical expert. He testified that her seizure disorder did not meet or equal a listing and did not interfere with her usual activities. (Tr. 43).

Dr. Alpern also testified as an independent medical expert. Some of his testimony is transcribed as "inaudible." The ALJ summarized his testimony at Tr. 16-17. Plaintiff has not objected that the ALJ's summary is inaccurate. Dr. Alpern testified that, if she had arthritis in both knees in 2001, he would limit her to sedentary work. (Tr. 54-55).

A vocational expert also testified. The ALJ asked the VE to assume a person who was limited to sedentary exertion, further limited by the need to avoid unprotected heights and dangerous moving machinery. The VE testified that person could not do plaintiff's past relevant work, but could do the jobs of hand packer and production work assembler, which are unskilled and sedentary, and which exist in significant number in the regional economy. (Tr. 51-52).

Plaintiff's counsel asked the VE to also assume that the person needed to elevate her feet for up to 1/3 of the working day. The VE testified that this would preclude doing sedentary unskilled work. (Tr. 52).

Dr. Alpern then testified that a person with Mrs. Petties' condition would need to elevate her feet only during the night, during breaks at work, and for one hour after work. The purpose

of elevating the feet is to relieve swelling in the legs and, according to Dr. Alpern, if she wore Jobst stockings, she probably would not have to raise her feet at all. (Tr. 53).

## Analysis

Plaintiff's first point is without merit. The failure to identify venous insufficiency as a severe impairment "is of no consequence to the outcome of the case" where the ALJ finds other impairments to be severe and therefore proceeds with the five-step evaluation process. ***Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010).**

Plaintiff next takes issue with the ALJ's assessment of her credibility. She points out that the ALJ used the boilerplate language that was criticized in ***Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010).** The use of the boilerplate language is not, however, necessarily fatal as long as the ALJ goes on to adequately discuss the reasons for his credibility determination. See, e.g., ***Carter v. Astrue*, 413 Fed. Appx 899, 905-906 (7th Cir. 2011)**.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).** Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." ***Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein**.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations

and restrictions due to pain or other symptoms." SSR 96-7p, at *3.[2]

Contrary to plaintiff's argument, the ALJ did, in fact, consider the relevant factors. ALJ Agatstein discussed plaintiff's credibility at Tr. 15-16. The ALJ found it significant that the degree of pain claimed by plaintiff was not supported by the objective medical evidence. This is a proper consideration since "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." **Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008)**. He also found it significant that the medical records reflect that her back pain was mild in 2002 and x-rays of her back were normal in October, 2002. The disc protrusion did not appear until July of 2005. The ALJ noted that, despite her claim of debilitating back pain, no doctor had suggested back surgery or prescribed a cane. Further, she used only conservative pain medication in that she took Vicodin occasionally but stopped taking it and used only Tylenol. He found that her activities of daily living cast doubt on her claim of disabling pain. Further, although she claimed she was also disabled by a seizure disorder, the medical records said her condition was stable, and she wrote on the seizure questionnaire that she could not even remember the last time she had a seizure.

Plaintiff takes issue with the reasons given by the ALJ. She cites to **Parker, supra**, for the proposition that a cane does not require a prescription. See, Doc. 19, p. 7. However, **Parker** does not hold that an ALJ cannot consider the fact that a cane was not prescribed or suggested by a health care provider. In context, the Court's statement was, "Absurdly, the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a

---

[2]Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." **Lauer v. Apfel, 169 F.3d 489, 492 (7th Cir. 1999)**. Social Security Rulings are "binding on all components of the Social Security Administration." **20 C.F.R. § 402.35(b)(1)**. They do not, however, "have the force of law or properly promulgated notice and comment regulations." **Lauer, id.**

cane. A cane does not require a prescription; it had been suggested to the plaintiff by an occupational therapist." **Parker, 597 F.3d at 922.** Further, the Seventh Circuit affirmed the credibility determination in **Castile v. Astrue, 617 F.3d 923, 930 (7th Cir. 2010)**; one of the factors considered by the ALJ was the fact that the plaintiff used a cane which had not been prescribed for her. Here, there is no evidence that any health care provider ever suggested that Mrs. Petties should use a cane. It was not error for the ALJ to reason that, if plaintiff's pain were as disabling as she said it was, one of her health care providers would have suggested she use a cane.

Plaintiff argues that she used conservative pain medication because she is "intolerant to multiple nonsteroidals." She cites to a doctor's note at Tr. 324 for this statement. See, Doc. 19, p. 7. That same note says that she had responded well to Vicodin and Skelaxin in the past. Vicodin is a pain reliever, and not a nonsteroidal anti-inflammatory drug. See, http://www.drugs.com/vicodin.html, accessed on January 19, 2012. Thus, the fact that she is "intolerant to multiple nonsteroidals" would not make her unable to tolerate Vicodin.

In short, the ALJ considered the relevant factors. The fact that he did not weigh the factors the way plaintiff would like does not mean that his credibility determination was legally insufficient. Plaintiff has not demonstrated any error with regard to the credibility findings. As the ALJ's credibility findings were not "patently wrong," they should not be overturned. **Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).**

Plaintiff's third argument fares better. She is correct that the ALJ erred in ignoring part of her treating doctor's opinion as to her limitations.

The ALJ said that Dr. Houle "indicated that she was to do strictly sedentary work." (Tr. 15). The ALJ also said that he gave "great weight" to Dr. Houle's opinion in this regard. (Tr. 17). However, Dr. Houle's opinion, expressed in December, 2000, was that Mrs. Petties was

limited to sedentary work with no bending or squatting and "she needs to do most of her work with her arms very low." (Tr. 236). The ALJ did not mention these additional restrictions at all.

An ALJ must "confront evidence that does not support his conclusion and explain why it was rejected." **Indoranto v. Barnhart**, 374 F.3d 470, 474 (7th Cir. 2004). It is error for an ALJ to selectively discuss a doctor's report, ignoring the parts that conflict with his decision. **Godbey v. Apfel**, 238 F.3d 803, 808 (7th Cir. 2000); **Myles v. Astrue**, 582 F.3d 672, 678 (7th Cir. 2009).

The Commissioner argues that the limitation to no bending or squatting is, by definition, included in the limitation to sedentary work, since sedentary work does not require bending or squatting. He is correct. See, SSR 83-14 & 83-10. However the Commissioner runs into trouble when he tries to defend ignoring the limitation of keeping her arms very low.

The Commissioner argues that the ALJ could reasonably have discounted this limitation because Dr. Houle was treating plaintiff for her knee, and not her arms. Doc. 23, p. 11. This argument is foreclosed by the **Chenery** doctrine, which "forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." **Parker v. Astrue**, **597 F.3d 920, 922 (7th Cir. 2010)**. See also, **McClesky v. Astrue**, 606 F.3d 351, 354 (7th Cir. 2010) ("[I]t improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision...").

The ALJ did not discount the limitation on use of plaintiff's arms on the basis now advanced in the Commissioner's brief; rather, the ALJ ignored that limitation, which constituted error. While ALJ Agatstein was not required to accept that part of Dr. Houle's opinion, he was not free to simply ignore it.

The failure to consider Dr. Houle's entire opinion requires remand. It should be understood that this Court is not making any suggestion as to whether plaintiff was, in fact,

disabled at the relevant time or as to what the ALJ's decision should be on reconsideration.

Remand of a social security case can be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is, itself, a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. See, ***Shalala v. Schaefer***, **113 S. Ct. 2625, 2629 (1993);** ***Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan***, **195 F.3d 975, 978 (7th Cir. 1999).**

Here, a sentence four remand is appropriate.

### Recommendation

This Court recommends that Commissioner's final decision be **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

Objections to this Report and Recommendation must be filed on or before **February 6, 2012.**

**Submitted: January 19, 2012.**

        **s/ Clifford J. Proud**
        **CLIFFORD J. PROUD**
        **UNITED STATES MAGISTRATE JUDGE**